**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------- X
NIPPON KAISHA LINE LIMITED,
Individually and on behalf of
M/V RIGEL LEADER (IMO No. 9604940)

       Plaintiff,

  -against-

O.W. BUNKER USA INC.,
NUSTAR ENERGY SERVICES, INC.,
KIRBY INLAND MARINE LP,
and ING BANK N.V.

       Defendants.
------------------------------------------------------- X

**14 Civ. 10091 (VEC)**

**(ORAL ARGUMENT REQUESTED)**

**MEMORANDUM OF LAW**
**IN SUPPORT OF O.W. BUNKER USA INC.'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................4

STATEMENT OF FACTS ..........................................................................................................6

STANDARD OF REVIEW .......................................................................................................10

ARGUMENT .............................................................................................................................10

    I.    OW USA HAS A MARITIME LIEN BECAUSE NYKTC WAS AUTHORIZED BY THE OWNER ...............................................................................................10

    II.    NUSTAR DOES NOT HAVE A MARITIME LIEN BECAUSE OW USA WAS NOT THE OWNER'S AGENT AND A PERSON AUTHORIZED BY THE OWNER DID NOT DIRECT OW USA TO SPECIFICALLY SELECT NUSTAR ................................12

    III.    NYKTC BREACHED ITS CONTRACT WITH OW USA BECAUSE IT FAILED TO PAY FOR THE BUNKERS ...............................................................................13

    IV.    THE INTERPLEADER FUNDS SHOULD BE DISBURSED TO OW USA AS A MATTER OF EQUITY TO BE DISBURSED AMONG ALL OF ITS CREDITORS CONSISTENT WITH OW USA'S LIQUIDATION PLANS AND THE UNITED STATES BANKRUPTCY CODE ...............................................................................15

CONCLUSION ..........................................................................................................................17

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)..........................................................................10

*Brown v. Eli Lilly & Co.*, 654 F.3d 347 (2d Cir. 2011) ...................................................................10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1985) ................................................................................10

*Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473 (2d Cir. 2014) .......................................10

*In re AppOnline.com, Inc.*, 315 B.R. 259 (Bankr. E.D.N.Y 2004)..................................................16

*In re Ionosphere Clubs, Inc.*, 101 B.R. 844 (Bankr. S.D.N.Y. 1989).............................................16

*In re O.W. Bunker USA Inc.*, Bankr. D. Conn., Case No. 14-51722 (JAM)
(filed Nov. 13, 2014)..........................................................................................................................9

*Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV*,
199 F.3d 220 (5th Cir. 1999) ...........................................................................................................11

*Marine Fuel Supply & Towing, Inc. v. M/V KEN LUCKY*, 869 F.2d 473 (9th Cir. 1988) ............11

*O'Rourke Marine Servs. L.P., L.L.P. v. M/V COSCO Haifa*, No. 15-CV-2992 (SAS),
2016 WL 1544742 (S.D.N.Y. Apr. 8, 2016).........................................................................11, 12, 13

*Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42 (2d Cir. 2015) .......................................10

*Valero Mktg. & Supply Co. v. M/V ALMI SUN, IMO No. 9579535*, No. 14-2712,
2015 WL 9459971 (E.D. La. Dec. 2, 2015).................................................................................12, 13

**Statutes and Rules**

11 U.S.C. § 503..................................................................................................................................16

46 U.S.C. § 31342...........................................................................................................................4, 10

Fed. R. Civ. P. 8................................................................................................................................12

Fed. R. Civ. P. 56..............................................................................................................................10

**Other**

*PST Energy Shipping 7 LLC and Product Shipping and Trading SA v. OW Bunker Malta Ltd
and ING Bank SA (Res Cogitans)* [2016] UKSC 23 (Judgment given on May 11, 2016) ..5, 14, 15

**PRELIMINARY STATEMENT**

Two claimants remain in this interpleader action: O.W. Bunker USA Inc.[1] ("OW USA") and its creditor NuStar Energy Services, Inc. ("NuStar"). Both claimants asserted maritime lien claims against the interpleader fund, which is a substitute *res* for the vessel RIGEL LEADER. OW USA also asserted a breach of contract claim against plaintiff Nippon Kaisha Line Limited ("Nippon Kaisha") and party-in-interest NYK Trading Corporation ("NYKTC").

The maritime lien claims are cognizable only under the Commercial Instruments and Maritime Lien Act ("CIMLA"). 46 U.S.C. § 31342. CIMLA requires a maritime lien claimant to show that (1) it provided necessaries, (2) to a vessel, (3) on the order of the owner or a person authorized by the owner. The first two elements are undisputedly met in this interpleader action: necessaries (bunkers) were provided to a vessel (RIGEL LEADER). However, neither OW USA nor NuStar received orders directly from the owner. The third element, therefore, requires an analysis of the relationships between the parties to the series of contracts. Did OW USA or NuStar receive orders from "a person authorized by the owner?" 46 U.S.C. § 31342(a). This is a question of agency.

For ease of reference, the series of contracts at issue in this interpleader action can be summarized as follows:

Nippon Yusen Kabushiki Kaisha → NYKTC → OW USA → NuStar/O'Rourke Marine Services

In order to prove that it has a maritime lien, OW USA must show that (a) NYKTC was the owner's agent or (b) a person authorized by the owner directed NYKTC to specifically select

---

[1] The last four digits of the Debtors' taxpayer identification numbers follow in parentheses: O.W. Bunker Holding North America Inc. (7474), O.W. Bunker North America Inc. (7158) and O.W. Bunker USA Inc. (3556). The Debtors' address is: OW Bunker c/o Alvarez & Marsal, LLC, Attn: Kelly Beaudin Stapleton, 600 Madison Avenue, 7th Floor, NY, NY 10022.

OW USA. In order to prove that it has a maritime lien, NuStar must show that (a) OW USA was the owner's agent or (b) a person authorized by the owner directed OW USA to specifically select NuStar. While OW USA is able to sustain its burden – OW USA received its order from NYKTC, who was undisputedly authorized as agent to order bunkers for the vessel – NuStar cannot sustain its burden because OW USA was not the owner's agent and a person authorized by the owner did not direct OW USA to specifically select NuStar.

OW USA also asserted a breach of contract claim. The basis for this claim is the contract between NYKTC and OW USA, which OW USA fully performed by supplying bunkers to the vessel, and which NYKTC breached by failing to pay for the bunkers. The contract is subject to the O.W. Bunker Group's standard terms and conditions, and governed by English law. To the extent that the Court exercises jurisdiction over OW USA's breach of contract claim, then it should follow the English Supreme Court's precedent from *PST Energy Shipping 7 LLC and Product Shipping and Trading SA v. OW Bunker Malta Ltd and ING Bank SA (Res Cogitans)* [2016] UKSC 23 (Judgment given on May 11, 2016). In *Res Cogitans*, the English Supreme Court's first judgment interpreting the O.W. Bunker Group's standard terms and conditions in the context of the O.W. Bunker Group's bankruptcies, the English Supreme Court held that the buyer/vessel had no defense to the seller/O.W. Bunker's claim for payment even if the physical supplier was not paid.

Under these circumstances, the Court should grant OW USA's motion for summary judgment on its maritime lien and breach of contract claims, dismiss NuStar's maritime lien claim with prejudice, and grant such other and further relief as the Court may deem appropriate. Such a result would conform to principles of equity by allowing the interpleader fund to flow through OW USA's Liquidating Trust to OW USA's creditors, including but not limited to

NuStar, pursuant to the United States Bankruptcy Code and OW USA's Bankruptcy Court-confirmed Liquidation Plans.

## STATEMENT OF FACTS

Non-party Nippon Yusen Kabushiki Kaisha ("Nippon Yusen") was the time charterer of the vessel RIGEL LEADER.[2]  (Statement of Facts, ¶ 2).  Nippon Yusen was obligated to provide bunkers for the vessel pursuant to its time charter agreement with the owner.  (Statement of Facts, ¶ 3).  According to Mr. Daisuke Sano, Nippon Yusen's fuel team manager, Nippon Yusen acted on behalf of the owner when it ordered bunkers for the vessel.  (Statement of Facts, ¶ 4).  On or about October 7, 2014, Nippon Yusen ordered bunkers for the vessel from NYKTC. (Statement of Facts, ¶ 5).

Party-in-interest NYKTC, which seeks to be discharged from liability through this interpleader action, is an entity closely related to Nippon Yusen.  They are both within the NYK Group and, even though Nippon Yusen already paid NYKTC for this bunker supply, Nippon Yusen agreed to litigate this interpleader action for NYKTC and to deposit the interpleader fund. (Statement of Facts, ¶ 6-8).  NYKTC's main business was handling Nippon Yusen's bunker orders.  (Statement of Facts, ¶ 9).  According to the Complaint for Interpleader, NYKTC was "responsible for ordering the bunker fuel for the M/V RIGEL LEADER and other similar vessels under associated ownership and control." (Statement of Facts, ¶ 10).

On or about October 8, 2014, NYKTC ordered bunkers from OW USA.  (Statement of Facts, ¶ 11).  On or about October 9, 2014, OW USA confirmed NYKTC's order.  (Statement of Facts, ¶ 12).  The contract between NYKTC and OW USA is subject to the OW Bunker Group

---

[2] The identification of Nippon Kaisha as time charterer and as plaintiff in the Complaint for Interpleader was apparently a "mistake."  (Statement of Facts, ¶ 1).  This mistake should be corrected before the Court entertains any motions to discharge the vessel interests.

Terms and Conditions of Sale for Marine Bunkers (Edition 2013).  (Statement of Facts, ¶ 13).

Several clauses of the terms and conditions are relevant to OW USA's breach of contract claim:

- Clause C.6: "The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel ….";

- Clause H.2: "Until full payment of the full amount due to the Seller has been made … the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller, and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel …";

- Clauses I.5 and I.7, among others, state that any delays in payment shall be subject to interest, fees, and costs; and

- Clauses P.1, P.2, and P.5 provide that any disputes arising in connection with the bunker supply contract shall be governed by and construed in accordance with English law and submitted to London arbitration, except that "US law shall apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action."

It is undisputed that when ordering the bunkers from OW USA – for the account of the "MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV RIGEL LEADER AND/OR NYK TRADING CORPORATION, JAPAN" – NYKTC was acting as the owner's authorized agent.[3]  (Statement of Facts, ¶ 16).  In contrast, there is no evidence in the record that OW USA was acting as the owner's authorized agent when it ordered bunkers from NuStar.[4]  Rather, when it ordered bunkers from NuStar, OW USA acted independently and for its own account – it had a $40 million credit line with NuStar[5] – and it did not expressly or impliedly represent to NuStar that it was acting as the owner's authorized agent.  (Statement of Facts, ¶ 17-

---

[3] Nippon Kaisha, who commenced this interpleader action "on behalf of" the vessel, did not deny an allegation that "NYKTC was authorized as agent to order supplies of bunkers and related services for the M/V RIGEL LEADER." (Statement of Facts, ¶ 14).  Moreover, NuStar – the only other competing claimant remaining in this interpleader action – admitted that the allegation was true.  (Statement of Facts, ¶ 15).

[4] OW USA also ordered part of the bunkers from non-party O'Rourke Marine Services ("O'Rourke").  O'Rourke is not a party to this interpleader action because OW USA paid O'Rourke.  Therefore, as will be further explained below, OW USA is the only claimant to part of the interpleader fund.

[5] NuStar did not extend credit to Nippon Yusen or NYKTC.  NuStar claims that it generally relied on the value of vessels, but it did not perform any credit checks on vessels.  (Statement of Facts, ¶ 19).

18). Moreover, there is no evidence in the record that any person authorized by the owner directed OW USA to specifically select NuStar.

NuStar's lack of relationship with the vessel's owners or any other authorized person – before, during, and after the bunker supply – is further corroborated by the fact that NuStar's Sales Agreement was with OW USA and does not otherwise mention the owner, Nippon Yusen, or NYKTC. (Statement of Facts, ¶ 20) (Noting "Sold to" OW USA). In other words, each contract in the series of contracts was a separate contract of purchase and sale. NuStar's contract with OW USA was independent of the owner and its authorized agents. Moreover, NuStar did not directly communicate with the owner, Nippon Yusen, or NYKTC prior to or during the bunker supply. Rather, the time and place of delivery was coordinated by a barge service and the vessel's local port agent (who did not have authority to order bunkers). (Statement of Facts, ¶ 21). Finally, NuStar also issued its interim and final invoices, "Billed To" OW USA, without any reference to the owner, Nippon Yusen, or NYKTC. (Statement of Facts, ¶ 22).

The timing and amount of OW USA's invoice to NYKTC and NuStar's interim and final invoices to OW USA is particularly enlightening. After the delivery, on October 16, 2014 – before NuStar issued any invoice to OW USA – OW USA issued an invoice to NYKTC jointly and severally with "M/V RIGEL LEADER AND/OR OWNERS/CHARTERERS" in the amount of $541,282.53.[6] (Statement of Facts, ¶ 23). One week later, on October 21, 2014, NuStar issued an interim invoice to OW USA in the amount of $508,976.30. (Statement of Facts, ¶ 24). If this interim invoice was in fact the final invoice, then OW USA would have <u>lost</u> money on the "Fueloil" part of the bunker supply. Whereas OW USA charged NYKTC $494.252/MT of Fueloil, NuStar's interim invoice would have charged OW USA $497.62/MT of Fueloil. OW

---

[6] The part of this invoice which relates to bunkers physically delivered by O'Rourke – and is not subject to any competing claims – is the "Gasoil" line item in the amount of $35,640.01.

USA was, after all, a trader that was regularly exposed to the risk of losses as opposed to being a broker that would have earned a fixed commission or fee no matter what price NuStar charged.

However, OW USA and NuStar had entered into a monthly pricing contract pursuant to which NuStar's interim invoices to OW USA were adjusted at the end of each month to match the average monthly prices of a specific bunker index plus NuStar's per-barrel fixed margin, thereby mitigating the risks of volatility in the bunker markets. (Statement of Facts, ¶ 25). Pursuant to this monthly pricing contract, on November 5, 2014, NuStar sent a revised and final invoice to OW USA, again solely for OW USA's own account, in the amount of $484,256.30. (Statement of Facts, ¶ 26).

On November 6, 2014, OW USA's parent company, O.W. Bunker & Trading A/S, suddenly announced that it was applying to the Danish courts for restructuring. (Statement of Facts, ¶ 27). On November 13, 2014, OW USA filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut ("Bankruptcy Court") in a case captioned *In re O.W. Bunker USA Inc.*, Bankr. D. Conn., Case No. 14-51722. (Statement of Facts, ¶ 28). On November 19, 2015, OW USA submitted the Debtors' First Modified Liquidation Plans ("Liquidation Plans") to the Bankruptcy Court. (Statement of Facts, ¶ 29). On December 15, 2015, the Bankruptcy Court entered an Order Confirming the Debtors' First Modified Liquidation Plans ("Confirmation Order"). (Statement of Facts, ¶ 30). On January 4, 2016, pursuant to the Liquidation Plans and Confirmation Order, OW USA and ING Bank N.V., as Security Agent, each transferred all of their interests in respect of the receivable at issue in this interpleader action to the O.W. Bunker USA Inc. Liquidating Trust ("Liquidating Trust"). (Statement of Facts, ¶ 31). The Liquidating

Trust is continuing to liquidate the accounts receivables, including the receivable at issue in this interpleader action.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1985). "The moving party bears the burden of showing the absence of a genuine dispute as to any material fact." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).

## ARGUMENT

**I.  OW USA HAS A MARITIME LIEN BECAUSE NYKTC WAS AUTHORIZED BY THE OWNER**

CIMLA provides in pertinent part:

> (a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
> (1) has a maritime lien on the vessel;
> (2) may bring a civil action in rem to enforce the lien; and
> (3) is not required to allege or prove in the action that credit was given to the vessel.
> (b) This section does not apply to a public vessel.

46 U.S.C. § 31342. In other words, a maritime lien claimant must show that (1) it provided necessaries, (2) to a vessel, (3) on the order of the owner or a person authorized by the owner.

In the absence of direct privity with the owner, the third element of the statute requires an analysis of the relationships between the parties to the series of contracts.  *O'Rourke Marine Servs. L.P., L.L.P. v. M/V COSCO Haifa*, No. 15-CV-2992 (SAS), 2016 WL 1544742, *3-4 (S.D.N.Y. Apr. 8, 2016).  Two lines of cases have developed which address whether the relationships between the parties give rise to a maritime lien.  First, in the principal/agent or middleman line of cases, typified by *Marine Fuel Supply & Towing, Inc. v. M/V KEN LUCKY*, 869 F.2d 473 (9th Cir. 1988), courts hold that suppliers in a line of agency relationships have maritime liens.  *O'Rourke Marine Servs. L.P., L.L.P. v. M/V COSCO Haifa*, No. 15-CV-2992 (SAS), 2016 WL 1544742, *4 (S.D.N.Y. Apr. 8, 2016).  Second, in the general contractor/subcontractor line of cases, typified by *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV*, 199 F.3d 220 (5th Cir. 1999), courts hold that suppliers have maritime liens if they can show that a person authorized by the owner specifically directed the selection of the suppliers.  *O'Rourke Marine Servs. L.P., L.L.P. v. M/V COSCO Haifa*, No. 15-CV-2992 (SAS), 2016 WL 1544742, *4 (S.D.N.Y. Apr. 8, 2016).  "These lines of cases are not inconsistent with each other, but instead provide different tests for adjudicating claims for maritime liens based on the nature of the relationship between the vessel owner and the intermediary that procured the bunkers …." *Id*.

OW USA's maritime lien claim undisputedly meets all three elements of CIMLA.  OW USA provided necessaries (bunkers) to a vessel (RIGEL LEADER) on the order of the owner or a person authorized by the owner (NYKTC).  With respect to the third element, it is plain that NYKTC was an authorized agent of the owner.  First, NYKTC was "responsible for ordering the bunker fuel for the M/V RIGEL LEADER …." (Statement of Facts, ¶ 10).  Second, plaintiff Nippon Kaisha, who commenced this interpleader action "on behalf of" the vessel, did not deny

OW USA's allegation that NYKTC was an authorized agent for the owner. (Statement of Facts, ¶ 14). Pursuant to Fed. R. Civ. P. 8(b)(6), Nippon Kaisha's failure to deny that allegation is deemed an admission. Third, NuStar – the only other competing claimant remaining in this interpleader action – admitted that the allegation was true. (Statement of Facts, ¶ 15). In summary, it is undisputed that NYKTC was an authorized agent of the vessel. Therefore, OW USA satisfied all three elements of CIMLA and has a maritime lien against the interpleader fund which is a substitute *res* for the vessel.

## II. NUSTAR DOES NOT HAVE A MARITIME LIEN BECAUSE OW USA WAS NOT THE OWNER'S AGENT AND A PERSON AUTHORIZED BY THE OWNER DID NOT DIRECT OW USA TO SPECIFICALLY SELECT NUSTAR

In contrast to OW USA, NuStar cannot show that it furnished necessaries to a vessel on the order of the owner or a person authorized by the owner. Two federal courts have already denied maritime lien claims by other physical suppliers in the context of O.W. Bunker-related cases, and nothing about NuStar's claims distinguishes this matter from those well-reasoned decisions.

In the first case, *Valero Mktg. & Supply Co. v. M/V ALMI SUN, IMO No. 9579535*, No. 14-2712, 2015 WL 9459971 (E.D. La. Dec. 2, 2015), reconsideration denied, No. CV 14-2712, 2016 WL 475905 (E.D. La. Feb. 8, 2016), the court denied a physical supplier's maritime lien claim, and subsequently granted summary judgment to the vessel owner, because there was no evidence that the physical supplier received its order from a person authorized by the owner and because the owner did not direct the selection of the physical supplier. In the second case, *O'Rourke Marine Servs. L.P., L.L.P. v. M/V COSCO Haifa*, No. 15-CV-2992 (SAS), 2016 WL 1544742 (S.D.N.Y. Apr. 8, 2016), the court analyzed the relationships between the parties to the series of contracts under both the general contractor/subcontractor and principal/agent tests. *Id*.

at *4. The court found that the intermediary was not an agent for the vessel because each step in the series of contracts was carried out independent of the owner, as reflected in the fact that the contract supplier invoiced the owner more than the physical supplier invoiced the intermediary supplier. *Id*. The court also found that the owner did not direct the selection of the physical supplier. *Id*. The court, therefore held that the physical supplier did not have a maritime lien.[7]

As in *Valero* and *O'Rourke*, here, NuStar cannot show that OW USA was the owner's authorized agent and cannot show that any person authorized by the owner directed the selection of NuStar. The series of separate contracts underlying the bunker supply were independently entered into by the respective parties at "arm's length" with the sellers retaining the option to select the suppliers. (Statement of Facts, ¶ 32). OW USA acted for its own account, as corroborated by NuStar's sales agreement and invoices, and never represented to NuStar that it was acting as an agent for the vessel. (Statement of Facts, ¶ 17 and 22). Moreover, NuStar never communicated directly with any entity authorized to bind the vessel until after OW USA's insolvency. (Statement of Facts, ¶ 21). As such, NuStar's maritime lien claim should be dismissed with prejudice.

### III.   NYKTC BREACHED ITS CONTRACT WITH OW USA BECAUSE IT FAILED TO PAY FOR THE BUNKERS

The Complaint for Interpleader requests that NYKTC, a "party-in-interest" in this interpleader action, is discharged from liability relating to the bunker supply. As such, and due to the corresponding Order restraining OW USA from making efforts to collect its receivable outside of this interpleader action, OW USA asserted a breach of contract claim. The basis for this claim is that OW USA fully performed its end of the bargain by supplying bunkers to the

---

[7] In that matter, O.W. Far East contracted with the vessel owner's in-house bunker purchasing agent, non-party Chimbusco Americas, Inc. ("Chimbusco"). Just as Chimbusco was authorized to purchase bunkers on behalf of its corporate affiliate, here NYKTC was authorized to purchase bunkers on behalf of Nippon Yusen.

vessel, but that NYKTC breached the contract by failing to pay for the bunkers. The contract, however, is subject to the O.W. Bunker Group's standard terms and conditions, and governed by English law.

To the extent that the Court exercises jurisdiction over OW USA's breach of contract claim against NYKTC, then it should follow the English Supreme Court's precedent from *PST Energy Shipping 7 LLC and Product Shipping and Trading SA v. OW Bunker Malta Ltd and ING Bank SA (Res Cogitans)* [2016] UKSC 23 (Judgment given on May 11, 2016). (Statement of Facts, ¶ 34). In *Res Cogitans*, the English Supreme Court held that the buyer/vessel had no defense to claims for payment by the seller/O.W. Bunker even though the physical supplier was not paid. The court primarily relied upon Clause H.2 of the terms and conditions which states:

> Until full payment of the full amount due to the Seller has been made … the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller, and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel ….

(Statement of Facts, ¶ 13). According to the court, this clause meant that O.W. Bunker was not simply selling title or property to the bunkers, but that it was selling a license to immediately consume the bunkers pending payment on or before the expiration of the credit period. The court reasoned:

> The qualification clearly reflects a reality. Bunker suppliers know that bunkers are for use. If they grant relatively long credit periods combined with a reservation of title pending payment in full, it is unsurprising that they do so combined with an express qualification authorising use in propulsion, since standard terms prohibiting any use would be uncommercial or in practice, no doubt, simply ignored. Mr Crow vigorously resisted the introduction of any such considerations, on the basis that they are speculative and that the nature of a contract cannot change according to the level of certainty with which parties are to be taken to have expected that bunkers supplied might or might not be used in propulsion before payment for them was made. But OWBM's (and RMUK's) contractual terms and the assumed facts

14

> (particularly paras 13, 20 and 30) - together with an admissible modicum of commercial awareness on the court's part about how ships operate (and in particular how owners strive to keep them operating) and about the value of credit and the likelihood that full advantage of it will be taken - all point in one direction. They demonstrate that the liberty to use the bunkers for propulsion prior to payment is a vital and essential feature of the bunker supply business.

*PST Energy Shipping 7 LLC and Product Shipping and Trading SA v. OW Bunker Malta Ltd and ING Bank SA (Res Cogitans)* [2016] UKSC 23 (Judgment given on May 11, 2016).  Now, to be fair, the court's decision turned in part on the assumption that the physical supplier also permitted O.W. Bunker to allow the vessel to consume the bunkers prior to payment, but that assumption is proven by the facts in this case because NuStar's own terms and conditions at Clause 7 provide that title in and to the bunkers passed to the buyer (i.e. OW USA) as soon as the bunkers were loaded on the vessel – NuStar did not prohibit consumption before payment. (Statement of Facts, ¶ 33).

Under these circumstances, and in light of precedent from the English Supreme Court on this exact issue, the court should follow *Res Cogitans* and hold NYKTC liable, through the interpleader fund, to OW USA.  It should also award OW USA all of the other interest, fees, and late charges pursuant to the contract, which at a minimum is the amount on deposit as the interpleader fund.

## IV. THE INTERPLEADER FUNDS SHOULD BE DISBURSED TO OW USA AS A MATTER OF EQUITY TO BE DISTRIBUTED AMONG ALL OF ITS CREDITORS CONSISTENT WITH OW USA'S LIQUIDATION PLANS AND THE UNITED STATES BANKRUPTCY CODE

Following the collapse of OW USA's global parent, OW USA (and its U.S.-based affiliates) filed petitions for relief pursuant to chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  By filing petitions for relief, OW USA sought to liquidate its assets in

an efficient and coordinated manner in order to provide an equal distribution to similarly situated creditors consistent with the absolute priority rule and other bankruptcy principles.  *See In re AppOnline.com, Inc.*, 315 B.R. 259, 282 (Bankr. E.D.N.Y 2004) (noting that "prime bankruptcy policy of equal distribution among similarly situated creditors" is essential to the orderly operation of bankruptcy system); *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 851 (Bankr. S.D.N.Y. 1989) ("The traditional purpose of bankruptcy laws … is to provide reasonably expeditious rehabilitation of financially distressed debtors with a consequent distribution to creditors who have acted diligently").  The "absolute priority rule" ensures that no junior class of creditors receives a distribution before the senior classes receive payment in full.

NuStar's contrary arguments aside, NuStar is simply just another unsecured creditor of OW USA with respect to this RIGEL LEADER transaction and should share equally with OW USA's other unsecured creditor.  Therefore, the Court should distribute the Interpleader Funds directly to OW USA for an equitable and equal distribution consistent with the Bankruptcy Code and the requirements of the Debtors' Liquidation Plans.  To allow any other in this proceeding would upset the orderly operation of the bankruptcy system and provide NuStar, an unsecured creditor, with a undeserved windfall recovery on the RIGEL LEADER transaction.

Such an outcome is not an inequitable outcome for NuStar.  First, NuStar does not have priority payments rights to the Interpleader Funds because it (i) has failed to satisfy CIMLA's statutory requirements and does not have a valid maritime lien, and (ii) delivered the bunkers to the RIGEL LEADER outside the twenty-day window allowing for priority treatment under section 503(b)(9) of the Bankruptcy Code.  In this regard, NuStar has no more rights to the Interpleader Funds than any of OW USA's other unsecured creditors and equity requires that NuStar receive no greater distribution than any other unsecured creditor.

Furthermore, equity requires payment to OW USA because the Bankruptcy Court already adjudicated NuStar's right to payment as an unsecured creditor. As an active participant and litigant in OW USA's bankruptcy case, NuStar had an adequate opportunity, and in fact exercised its rights, to challenge its treatment under the Debtors' First Modified Liquidation Plans. NuStar had an opportunity to vote on the OW USA plan and, in fact, voted to reject OW USA's plan. Despite its vote, the Debtors' First Modified Liquidation Plans – and NuStar's treatment thereunder – are binding on NuStar. Under the plan – and except in certain transactions not relevant to the present interpleader – NuStar only shares in OW USA's assets *pro rata* with all of OW USA's other unsecured creditors.

Because NuStar's treatment under the Debtors' Liquidation Plans is equal to the treatment of OW USA's other unsecured creditors, equity demands that this Court award the Interpleader Funds to OW USA to distribute to all of its creditors consistent with the terms of the Debtors' First Modified Liquidation Plans. To do otherwise would circumvent the equitable purposes and principles of the Bankruptcy Code while countenancing a violation of the Bankruptcy Code's absolute priority rule. NuStar cannot recover more than it is legally entitled to under the Bankruptcy Code for the RIGEL LEADER transaction simply because it chose to litigate a dubious maritime lien right. Equity, and the Bankruptcy Code, requires that all of OW USA's unsecured creditors share equally in the Interpleader Funds.

## CONCLUSION

For the foregoing reasons, OW USA respectfully requests that the Court enter an Order granting OW USA's motion for summary judgment on its maritime lien and breach of contract claims, dismissing NuStar's maritime lien claim with prejudice, and granting such other and further relief as the Court may deem appropriate.

Dated: May 13, 2016
       New York, NY

                                          By:   */s/ Robert E. O'Connor*
                                          Davis Lee Wright
                                          Kaspar Kielland
                                          Robert E. O'Connor
                                          MONTGOMERY MCCRACKEN
                                          WALKER & RHOADS LLP
                                          437 Madison Avenue, 29th Floor
                                          New York, NY 10022
                                          Telephone:     (212) 867-9500
                                          Fax:               (212) 599-1759
                                          Email:           dwright@mmwr.com
                                                                kkielland@mmwr.com
                                                                 roconnor@mmwr.com

                                          *Attorneys for Defendant O.W. Bunker USA Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2016, I caused the forgoing to be filed on the Court's CM/ECF system for service on all counsel of record.

*/s/ Robert E. O'Connor*